HAMPTON FOODS, INC., Appellant,

v.

The AETNA CASUALTY AND SURETY COMPANY, Appellee.

HAMPTON FOODS, INC., Appellee,

v.

The AETNA CASUALTY AND SURETY COMPANY, Appellant.

Nos. 85–1155, 85–1192.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1985.

Decided March 24, 1986.

Rehearings Denied May 16, 1986.

John A. Walsh, Jr., St. Louis, Mo., for appellant.

Gary P. Paul, St. Louis, Mo., for appellee.

Before HEANEY, FAGG and BOWMAN, Circuit Judges.

HEANEY, Circuit Judge.

The Aetna Casualty and Surety Company appeals from an order of the district court which held that Aetna's "all-risks" insurance policy with Hampton Foods, Inc., provided coverage for loss suffered by Hampton when it was forced to vacate its building due to danger of the building's collapse. Hampton appeals from the order of the district court, 601 F.Supp. 58, which denied recovery for prejudgment interest, accrued interest on alleged corporate indebtedness, recovery of lost profits and penalties for vexatious refusal to pay. We affirm the finding of coverage and the denial of liability for lost profits, prejudgment interest and penalties for vexatious refusal to pay, and reverse and remand with respect to Aetna's liability for accrued interest on alleged corporate indebtedness.

## I. BACKGROUND.

Hampton commenced operation of a grocery store in August, 1979. On June 1, 1980, Aetna issued an insurance policy insuring Hampton's personal property against "loss or damage * * * resulting from all risks of direct physical loss" and covering loss of certain earnings and expenses under what is generally known as business interruption coverage. Aetna did not insure the building in which Hampton conducted its business and Hampton did not own the building. On June 13, 1980, plaster fell from the ceiling of the building and the building evidenced other signs that it was in imminent danger of collapse. On June 17, the building's owner told Hampton that the building could collapse at any time and that Hampton must vacate the premises. On July 3, the City Building Commissioner informed Hampton that it would not be permitted back in the building after July

8, 1980, unless the building was repaired. Over the July 4th weekend, Hampton removed its property and inventory from the building; the items were sold at salvage for $22,683.58. Hampton and Aetna later stipulated that the value of Hampton's inventory at the time of the salvage sale was $92,651.61 retail and $76,185.52 wholesale. Hampton also owned business equipment worth $10,221.00, which was lost when the building was demolished, without notice to Hampton, in August, 1980.

Aetna denied coverage for Hampton's losses, Hampton sued, and the district court granted summary judgment for Hampton on the issue of coverage. After further proceedings on damages, the district court, in an amended order, denied recovery for lost profits, prejudgment interest, interest expenses on alleged corporate indebtedness and damages for vexatious refusal to pay, and granted recovery for Hampton's continuing business expenses in the amount of $9,100.00 and for loss of business personal property in the amount of $68,447.08, for a total of $77,547.08. Both parties appeal.

## II. DISCUSSION.

We first turn to the issue of whether Aetna's policy provides coverage for Hampton's losses resulting from its sudden evacuation of the collapsing building. The relevant policy provision states: "[t]his policy insures against loss of or damage to the property insured * * * resulting from all risks of direct physical loss[.]" Aetna reasserts its contention that this language requires a "direct physical loss," and that there was no such loss here. Hampton countercontends that the policy requires only damage or loss resulting from the risk of direct physical loss, and that there was such a loss here.

The district court determined that the policy language was ambiguous, and that, accordingly, it must be construed against the insurer. *Heshion Motors v. Western Intern. Hotels*, 600 S.W.2d 526, 537 (Mo. App.1980). The court also cited the well-es-

tablished principle that language reasonably open to different constructions will be given the meaning that would ordinarily be understood by the layman who bought and paid for the policy. *Robin v. Blue Cross Hospital Service, Inc.*, 637 S.W.2d 695, 698 (Mo.1982) (en banc). The court determined that the "commonsense meaning of [the policy provision] is that any loss or damage due to the *danger* of direct physical loss is covered. Hampton's inventory suffered a loss because of a danger of direct physical loss."

■ We agree that the disputed language is ambiguous and, thus, must be construed in Hampton's favor. Although neither party has cited a case construing the policy language in question in a comparable fact situation, the district court's construction of the ambiguous language is reasonable. The gist of Aetna's contention is that construing the policy to cover mere "danger" or "risk" of physical loss is unreasonable because the policy would then cover any number of conjectural risks of loss which the parties were aware the policy would not cover. We agree with Aetna that not every risk of loss is covered by this policy. *See, e.g., Bros., Inc. v. Liberty Mutual Fire Ins. Co.*, 268 A.2d 611 (D.C. Cir.1970) (no direct physical damage due to business falloff attributable to imposition of curfew restrictions during a civil disturbance); *Cleland Simpson Co. v. Fireman's Insurance Co. of Newark, N.J.*, 392 Pa. 67, 140 A.2d 41 (Pa.1958) (no direct physical loss coverage for lack of access to property due to mere fear of possibility of a fire during a hurricane). Here, however, Hampton suffered direct, concrete and immediate loss due to extraneous physical damage to the building. Because of the unquestioned danger of reentering the building, Hampton could simply have left its property in the building pending its collapse; in that event, there would have been direct physical damage to the personal property. Hampton merely mitigated the damages—as it should have done—by removing and salvaging as much property as it could before the building's destruction. The loss in value of Hampton's inventory necessitated by the sudden evacuation, and the destruction of its business equipment upon the building's collapse, constitute "loss or damage to the property insured * * * resulting from all risks of direct physical loss."

■ Our previous discussion also answers Aetna's contention that even if there was a loss, it is not covered because it is within a policy exclusion for "loss caused by * * * [w]ear and tear, deterioration * * * bulging or expansion of pavements, foundations, walls, floors, roofs, or ceilings[.]" This exclusion applies to damage caused by aging or deterioration of the building or by settlement of the land underlying the structure but does not apply when damage is caused by application of some external force such as fire, wind or snowstorm. The district court adopted the conclusion of two professional engineers that the cause of the building's dangerous condition was either a windstorm or a heavy snow which caused one or more tie beams to snap, thus weakening the structure, and causing other tie beams to snap. "They state that there was no significant evidence of wear and tear, deterioration, rot, corrosion, or structural defect causing spontaneous mechanical breakdown, or any other internal condition of the building discovered which would account for the occurrence of the damage to the building." We find no error in these findings of fact.

■ For similar reasons, we reject Aetna's argument that Hampton's loss comes within a policy exclusion for "[l]oss occasioned directly or indirectly by * * * enforcement of any local or state ordinance or law regulating the construction, repair or demolition of buildings or structures[.]" The district court held that this exclusion is inapplicable because the windload or snowload damage to the building was an

> extraneous happening * * * covered by the insurance policy. This extraneous happening is the dominant and efficient cause of the loss and Hampton Foods may recover even if another cause contributed to the loss, at least where the

other cause is not an excluded peril under the policy. *Hayden v. City of Sikeston,* 616 S.W.2d 575 (Mo.App.1981).

The condemnation decree did not cause or increase the loss. The damage to the building and the danger of its collapsing caused the loss.

We agree with this reasoning. The windload or snowload damage to the building and the directly resulting evacuation was the cause of Hampton's loss. The condemnation decree did not cause or increase that loss. Construing the exclusion clause to preclude recovery here would violate the reasonable expectations of the layman who purchased the policy. *See Aetna Casualty & Surety Co. v. Haas,* 422 S.W.2d 316, 321 (Mo.1968) ("Exclusion clauses * * * must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor.") Thus, one would reasonably expect that if a building was severely damaged by a windstorm or snowstorm, rendering its collapse imminent and making access to the building extremely dangerous, this would constitute a loss not due to a subsequent condemnation of the structure.

■ We now turn to the issue of damages. Hampton's first contention is that the trial court erred in denying recovery for lost profits. The court determined that Hampton had suffered losses throughout its entire period of operation, and that, although the business was a new one in which greater than normal losses should be expected, there was inadequate proof that Hampton would have achieved profitability during the period of business interruption. Although we agree with Hampton that the trial court erred in considering the losses shown on Hampton's 1981 tax return—because this reflected the loss due to the business evacuation—the trial court recognized this error in its amended order and concluded that the business would have been unprofitable even without this loss. We find no clear error in this conclusion.

■ Next, we reject Hampton's elaborate argument concerning prejudgment interest under Mo.Stat. § 408.020. The district court held that "prejudgment interest was not warranted * * * due to the speculative nature of the plaintiff's claim." We agree. In *St. Joseph Light & Power Co. v. Zurich Ins. Co.,* 698 F.2d 1351, 1355 (8th Cir.1983), we stated that "[t]he Supreme Court of Missouri has held that section 408.020 requires that prejudgment interest [must] be awarded whenever the amount due is liquidated, or, although not strictly liquidated, is readily ascertainable by reference to recognized standards." We further noted that prejudgment interest should not be denied merely because "the defendant does not know precisely how much he will eventually be required to pay because he contests liability or asserts counterclaims, setoffs or defenses, even though the plaintiff's claim is ascertainable to a specific dollar amount." 698 F.2d at 1338. Here, the problem is not simply that Aetna denied liability or that Hampton's damages could not be ascertained with precision. Instead, Hampton's claim presented a novel situation where there was justifiable lack of certainty as to whether liability existed and as to the measure of damages. *See Fohn v. Title Insurance Corporation of St. Louis,* 529 S.W.2d 1 (Mo.1975) (en banc). Under such circumstances, we agree that the damages were not sufficiently ascertainable to justify an award of prejudgment interest. *See St. Louis Housing Authority v. Magafas,* 324 S.W.2d 697, 700 (Mo.1959) ("[I]nterest is not usually allowed on unliquidated demands for the reason that the person liable does not know the amount he owes and hence cannot be in default because of his failure to pay.")

■ For similar reasons, we reject Hampton's claim that the trial court erred in refusing to award penalties for vexatious refusal to pay under Mo.Rev.Stat. §§ 375.420 and 375.296 (1978). To recover, Hampton must show that Aetna's failure to pay "was willful and without reasonable cause or excuse." *Groves v. State Farm Mutual Automobile Ins. Co.,* 540 S.W.2d

39, 42 (Mo.1976). Hampton has failed to meet this standard because there are several questions of fact and law relating to coverage and damages upon which there could be "an honest difference of opinion." *Id.*

We come next to the issue of whether the trial court erred in concluding that Hampton was not entitled to recover interest on its business loans during the period of business interruption. Part III of the Aetna-Hampton policy "insures against loss of earnings and additional costs and expenses resulting directly from necessary interruption of business[.]" The district court determined that interest charges were not covered under Part III, subsection A(1), because that provision only covers "the *excess* of the total costs and expenses * * * *over and above* the total costs of such operation that would normally have been incurred." The court next determined that Hampton could not recover under Part III, subsection A(4), which covers "expenses * * * necessarily incurred for the purpose of reducing loss under this policy" because its interest expenses were not incurred to reduce losses.

Hampton argues that the district court erred in overlooking its argument that interest expenses are covered under Part III, subsection A(2), which provides:

A.  The company shall be liable

$$* \qquad * \qquad * \qquad *$$

2.  For the reduction in Earnings (as hereinafter defined) during the period of restoration less charges and expenses which do not necessarily continue, resulting directly from the necessary interruption of business from a peril insured against.

Part III, subsection C(1) provides:

1.  For the purpose of this insurance, "earnings" are defined as net profit plus payroll expense, taxes, *interest*, rents and all other operating expenses earned by the business. [Emphasis supplied.]

■■■ Aetna responds by arguing that this subsection refers only to interest "earned" and not interest "paid out." We

reject this contention. Although the ordinary meaning of the word "earned" seems to support Aetna's contention, this word is a term of art with respect to continuing operating expenses covered by a business interruption policy. Such policies—like that at issue here—have widely been construed to include coverage for "fixed charges and expenses necessarily continuing during the suspension period to the extent that they would have been earned[.]" Annot., *Business Interruption or Use and Occupancy Insurance*, 83 A.L. R.2d 885, 904 (1962); *see also Hawkinson Tread Tire Service Co. v. Indiana Lumbermans Mut. Ins. Co.*, 362 Mo. 823, 245 S.W.2d 24 (1951); *Associated Photographers, Inc. v. Aetna Casualty & Surety Co.*, 677 F.2d 1251 (8th Cir.1982). In other words, continuing operating expenses are generally recoverable to the extent the insured would have been able to pay for them had it continued in operation. Although Aetna's policy may be inartfully drafted, the only way to reconcile the word "earned," with the list of what are clearly continuing operating costs such as taxes, is to follow this construction. Additionally, to the extent the policy language is ambiguous, we must construe it in Hampton's favor. Thus, we find that Hampton's interest charges—to the extent Hampton can establish them on remand—are includable in its damages to the extent Hampton would have been able to pay these charges had the building difficulties not occurred. *See* 83 A.L.R.2d at 912.

■■■ There are two remaining issues with respect to the interest costs question. First, Aetna contends that the loans in question were not made to Hampton, Inc., but were made to the two proprietors of Hampton in their individual capacities. Hampton counterclaims that the loans were for the business purposes of Hampton, Inc. We cannot resolve this dispute on this record, and thus leave its resolution to the trial court on remand. Aetna is liable for interest on that portion of the loans used for Hampton's business purposes.

The final question concerns the time period for which Hampton's continuing interest charges are recoverable. The policy covers losses "during the period of restoration." Part III, subsection C, defines "period of restoration" as

> [t]he length of time, commencing with the date of damage or destruction, which would be required, with the exercise of due diligence or dispatch, to repair, or rebuild or replace the damaged or destroyed property.

It is clear that this language contemplates the *"theoretical* time period it would have taken to" reenter business. *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 596 F.2d 283, 290 (8th Cir.1979). Hampton contends that this theoretical period extends from the time of the evacuation until the present because it was unable to reenter business, even through the exercise of due diligence, until it received payments from Aetna for its losses. There is partial support for this position in at least two cases. *Omaha Paper Stock Co. v. Harbour Ins. Co.*, 445 F.Supp. 179, 187 (D.Neb.1978), *aff'd*, 596 F.2d 283 (8th Cir.1979); *Eureka-Security Fire & Marine Ins. Co. v. Simon*, 1 Ariz. App. 274, 401 P.2d 759, 763–64 (Ariz.Ct. App.1965).

Aetna's argument is that the proper period of recovery is the theoretical amount of time it would have taken Hampton to reenter business had it received payment from Aetna. It cites several cases which adopt the theoretical period of recovery as the proper measure, but none of these cases squarely discuss the issue at hand. The implication of these cases, *see, e.g., Rogers v. American Ins. Co.*, 338 F.2d 240, 240–44 (8th Cir.1964); *Beautytuft, Inc. v. Factory Ins. Ass'n*, 431 F.2d 1122, 1123–25 (6th Cir.1970), is that the theoretical period of restoration does not contemplate delay caused by refusal to pay a disputed claim and instead contemplates the theoretical period of time required for reentry into business had the insurance company timely paid.

We agree with the position taken by the district court in the *Omaha Paper*

*Stock Co.*, 445 F.Supp. 179, case, where the court used the standard of a theoretical period of restoration but allowed a reasonable extension of that period where restoration delay was due to actions of the insurance company. This is a factual question to be determined by the trial court on remand.

Affirmed in part, reversed and remanded in part for further proceedings consistent with this opinion.