# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 12-1070

———————————————

Travelers Property Casualty Insurance Company of America, formerly known as Travel Indemnity Company of Illinois

*Plaintiff - Appellant*

v.

National Union Insurance Company of Pittsburgh, Pennsylvania

*Defendant - Appellee*

Kansas City Power & Light; Reliance National Insurance Company

*Defendant*s

———————————————

No. 12-1151

———————————————

Travelers Property Casualty Insurance Company of America, formerly known as Travel Indemnity Company of Illinois

*Plaintiff - Appellee*

v.

National Union Insurance Company of Pittsburgh, Pennsylvania

*Defendant - Appellant*

Kansas City Power & Light; Reliance National Insurance Company

*Defendant*s

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: January 15, 2013
Filed: November 1, 2013
_____

Before BYE, MELLOY, and SMITH, Circuit Judges.
_____

MELLOY, Circuit Judge.


In a prior appeal, we held that Travelers Property Casualty Insurance Company of America ("Travelers"), who paid $10 million to settle claims on an excess policy, was entitled to receive $10 million from a primary insurer who had obtained a larger judgment through subrogation litigation against a third party. Travelers Prop. Cas. Ins. Co. of Am. v. Nat. Union Ins. Co. of Pittsburgh (Travelers I), 621 F.3d 697 (8th Cir. 2010). We expressly declined to rule on the issues of attorneys' fees, litigation expenses, and prejudgment or postjudgment interest.

On remand, the district court interpreted our prior opinion as already having decided the attorneys' fee issue and as requiring a common-fund offset against the $10 million award to reflect an apportionment to Travelers of a share of expenses from the subrogation litigation. The district court also held that our prior opinion precluded the possibility of awarding prejudgment or postjudgment interest to Travelers.

The district court erred in holding that we had decided the attorneys' fee issue in our prior opinion. That error was harmless because we now hold that the equitable common-fund doctrine applies. We also hold, however, that it is necessary to amend the amount of the common-fund offset.

-2-

Further, the district court erred in holding that our prior opinion precluded prejudgment and postjudgment interest. That error was not harmless, and we reverse. We hold that the award to Travelers must be increased to reflect prejudgment and postjudgment interest, and we direct the district court to enter judgment as detailed below.

I.      Background

As described in greater detail in Travelers I, the current dispute between insurance companies and Kansas City Power and Light Company ("KCPL") arises from an explosion at a KCPL facility that caused more than $450 million in insured and uninsured losses. Travelers settled a claim on its excess insurance policy for $10 million after abstaining from participation in an agreement between KCPL and primary insurer National Union Insurance Company of Pittsburgh, Pennsylvania ("National Union"). The agreement between National Union and KCPL that Travelers elected not to join was an allocation agreement (the "Allocation Agreement") in which National Union and KCPL agreed to coordinate their pursuit of recoveries from potentially responsible third parties. The Allocation Agreement identified funds recovered through subrogation litigation as representing 55% insured losses and 45% uninsured losses. Subrogation litigation pursuant to the Allocation Agreement resulted in the recovery of $126 million through a settlement with several third parties and in a later recovery of a separate $97 million judgment against Rockwell Automation (the "Rockwell judgment"). Travelers did not participate in any of these recovery efforts.

In Travelers I, with a judgment entered on September 2, 2010, we held: (1) Travelers expressly preserved its right to recover subrogation proceeds only from the Rockwell judgment and not from the earlier-recovered $126 million settlement; (2) by failing to participate in the Allocation Agreement, Travelers waived the right to control underlying litigation decisions en route to National Union and KCPL

-3-

obtaining the $97 million judgment; (3) Travelers also waived the right to contest the allocation of subrogation proceeds as between insured and uninsured losses; (4) amounts allocated to KCPL pursuant to the Allocation Agreement were proceeds permissibly identified as uninsured losses and were not subject to Travelers's claims for subrogation; (5) Travelers, as a true excess insurer, held a priority $10 million claim but only as against National Union's 55% portion of the $97 million Rockwell judgment; and (6) National Union, through its contract of insurance with KCPL, was required to recognize Travelers's $10 million priority interest in the Rockwell judgment.

In that appeal, the parties asked us to interpret Missouri's equitable common-fund doctrine relating to attorneys' fees and to determine whether that doctrine applies in the present case. We identified the issue but expressly declined to rule upon it:

> We note that Missouri law holds parties sharing in a common fund must share in the expenses laid out to create that fund. See Keisker[v. Farmer], 90 S.W.3d 71, 75 (Mo. 2002) ("Where one litigates to create a fund for others, those sharing must contribute a proportional part of the expenses."). We also note, however, that the Travelers policy provides that Travelers's subrogation rights extend to interest and fees. *Regardless, the parties have not fully briefed, and we express no opinion regarding, how subrogation expenses should be allocated between Travelers and the parties to the Allocation Agreement. We note only that—regardless of whether and how expenses might ultimately be shared—the underlying decisions by National Union and KCPL to incur* those fees and expenses are examples of the litigation-related tactical decisions Travelers left solely to the discretion of National Union and KCPL.

Travelers I, 621 F.3d at 708 n.6 (emphasis added). And, in our instructions to the district court on remand, we stated:

We conclude that National Union . . . was bound to recognize Travelers's priority interest and must now disgorge $10 million from its 55% share of the $97 million judgment against Rockwell Automation.FN8

FN8. *Subject to any adjustments for interest, fees, expenses, etc., as to be determined.*

Id. at 723 & n.8 (emphasis added).

On remand, Travelers moved for fees, expenses and interest, asserting an entitlement to prejudgment and postjudgment interest at the Missouri statutory rate of 9%, citing Mo. Rev. Stat. § 408.020. Travelers also argued that National Union must reimburse Travelers for fees and expenses that Travelers incurred in pursuing the subrogation priority claim against National Union and KCPL. In addition, Travelers argued that it was entitled to a share of interest that National Union received from Rockwell Automation in association with the Rockwell judgment (National Union and KCPL had received over $18 million in interest and expenses from Rockwell Automation above and beyond the $97 million award).

National Union responded, arguing that prejudgment interest was not appropriate because the sum at issue was not a liquidated sum, Travelers had not made a sufficiently specific demand, and the issues raised in Travelers I and in proceedings leading up to Travelers I were novel. National Union also argued that Travelers was not entitled to postjudgment interest because Travelers cited only state law regarding postjudgment interest whereas the entitlement to such interest is determined as a matter of federal law. Finally, National Union argued that Travelers was not entitled to a reimbursement of any fees or litigation expenses or to share in interest payments received on the Rockwell judgment. Rather, National Union argued it was entitled to a credit against the $10 million judgment for an attorney fee amount determined through application of the common-fund doctrine. In asserting the common-fund theory, National Union presented estimates of fees and expenses that National Union

and KCPL incurred en route to obtaining both the $126 million settlement from third parties and the $97 million Rockwell judgment. National Union argued that, even though the Rockwell judgment and the earlier settlement involved different parties, much of the expense and effort in obtaining these two separate recoveries was essentially indivisible given the overlap of technical and legal issues.

Combining these arguments, Travelers asserted that National Union owed Travelers over $17 million, with interest continuing to accrue at a rate of more than $4,000 per day. National Union, in contrast, asserted that the total offsets or credits at issue should reduce its liability towards Travelers from $10 million to approximately $6 million.

The district court, in a first order on remand, rejected Travelers's claims for prejudgment and postjudgment interest, deeming Travelers I to have resolved the issue. The district court stated:

> The Eighth Circuit Court of Appeals stated that plaintiff was entitled to $10,000,000 from National Union "subject to" adjustments for interest, fees and expenses. "Subject to" clearly applies to the $10,000,000 - - it does not mean "in addition to."

The district court then addressed the issue of fees and the common-fund doctrine by quoting footnote 6 from Travelers I (set forth at length above). In doing so, however, the district court truncated the footnote and omitted the reference to policy language arguably in conflict with the common-fund doctrine. The district court also omitted the language that stated the issue had not been fully briefed and in which the prior panel expressly declined to resolve "whether or how" expenses might be shared. Travelers I, 621 F.3d at 708 n.6. Citing only the beginning of the footnote, the district court stated that the Court of Appeals had already determined that the common-fund doctrine applied and had determined that Travelers was required to share in the costs of obtaining the $97 million Rockwell judgment. The district court

-6-

concluded by ordering KCPL and National Union to "determine the amount of fees and expenses incurred in collecting the $97 million judgment." Finally, the district court ordered National Union to add the KCPL and National Union fees and expenses and "determine Travelers's proportionate share pursuant to Keisker v. Farmer, 90 S.W.3d 71 (Mo. 2002) (en banc)."

On December 28, 2011, National Union paid Travelers $6,013,017.15. This amount reflected an offset from the $10 million award assuming all interest, fee, and expense arguments would be resolved in National Union's favor. National Union also sought clarification from the district court and argued that the common-fund calculations should include fees and expenses for all third-party subrogation efforts, not simply those related to the Rockwell judgment. The district court entered an order reiterating that the common-fund expenses should be considered only as to the $97 million Rockwell judgment and that any fee offset should relate only to fees involved in obtaining that judgment.

KCPL submitted fees and expenses of $14,132,479.13 for obtaining the Rockwell judgment. National Union asserted that its own fees and expenses could not be segregated as between the $97 million Rockwell judgment and the $126 million settlement. Accordingly, National Union submitted fees and expenses of $6,074,931 for all subrogation efforts and argued that the ratio of the Rockwell judgment to the total subrogation recovery (97/(97+126)) was 43.49%. National Union ultimately asserted that 43.49% of its own submitted fees and expenses—$2,641,987—was attributable to obtaining the Rockwell judgment.

In an order dated January 6, 2012, the district court accepted the fee amounts as described above. The district court then added together National Union and KCPL's fees and expenses in obtaining the Rockwell judgment for total fees of $16,774,466. The court determined that Travelers's $10 million share of the $97 million Rockwell judgment was a 10.3% share and that Travelers should be

responsible under a common-fund theory for 10.3% of the $16,774,446 in fees and expenses, or $1,727,770. The district court subtracted this amount from the $10 million award and ordered National Union to pay to Travelers $8,272,2430.[1]

Travelers contested several aspects of this process including the basic issue of whether its contractual right of priority in subrogation proceeds precluded application of a common-fund credit. Second, Travelers argued that if the common-fund doctrine were to apply, the Rockwell judgment was actually $115 million rather than $97 million due to interest and other amounts National Union and KCPL received from Rockwell Automation. Third, Travelers argued that, to the extent any common fund existed, the common fund used for calculating a fee amount should relate solely to National Union's own fees and expenses. According to Travelers, because KCPL's share of the Rockwell judgment was not subject to Travelers's claim, it would be an inequitable windfall to National Union if Travelers's award was reduced by a proportion related to KCPL's fees when only National Union was paying the award to Travelers.[2] Fourth, Travelers argued that National Union had waived any

_____

[1]The district court did not indicate that National Union was to reimburse any of the credited fee amount of $1,727,770 to KCPL, and KCPL is not a party to the present appeal.

[2]Travelers argued in its responsive brief to the district court:

Even if the common fund doctrine could apply, despite the plain language of Travelers' policy, the absence of any legal precedent and National Union's waiver, National Union would not be entitled to the amounts it claims in its Suggestions. First, the vast majority of the expenses for which National Union seeks reimbursement are KCPL's expenses, not National Union's. The Eighth Circuit held that Travelers was not entitled to recover from KCPL's share of the recoveries. See Travelers, 621 F.3d at 713–15. National Union offers no explanation as to why Travelers should be required to reimburse National Union for a share of expenses that were incurred solely by KCPL. Since National Union paid no part of KCPL's expenses, there would be simply no basis for Travelers to arbitrarily reimburse National Union for such amounts.

entitlement to fees and expenses by failing to assert such a claim as an affirmative defense or counterclaim earlier in the litigation. According to Travelers, National Union's failure to raise the issue earlier caused actual prejudice to Travelers because it deprived Travelers of an opportunity to conduct discovery concerning the other parties' fees and expenses. Finally, and related to the waiver argument, Travelers contested the factual basis of the National Union fee claims, noting that National Union itself used the term "approximately" when presenting its fee and expense claims to the district court and also noting that there were no factual or legal bases for adopting the 43.49% proportionate share of National Union's total subrogation fees and expenses as being attributable to the Rockwell judgment.[3]

National Union appeals the fee calculation, seeking a greater credit pursuant to the common-fund doctrine. Travelers appeals the denials of interest, the grant of a common-fund credit to National Union, and the amount of that credit.

II.     Discussion

A.     Attorneys Fees/Common-Fund Liability

1.     Application of the Common-Fund Doctrine

Missouri recognizes the equitable common-fund doctrine which holds that if one or more parties take on the risk and bear the expense of creating a common fund of recovery for additional parties to share, those additional parties must then compensate the original parties for a portion of those expenses before sharing in the

---

[3]KCPL's fees resulted largely from a contingency fee agreement with its attorneys, and Travelers does not appear to challenge the factual basis of the KCPL attorney fees. National Union presented amounts based upon affidavits from counsel, and the affidavits purported to quote conservative or low estimates citing to billing records that counsel described as not encompassing all amounts billed.

common fund. See Keisker v. Farmer, 90 S.W.3d 71, 75 (Mo. 2002) (en banc). A common-law equitable doctrine, however, "is not an option 'where it would be inconsistent with the terms of the contract.'" Messner v. Am. Union Ins. Co., 119 S.W.3d 642, 649 (Mo. Ct. App. 2003) (quoting Anison v. Rice, 282 S.W.2d 497, 503–04 (Mo.1955)). Travelers, therefore, must share in at least a portion of the expense that the parties to the Allocation Agreement incurred in pursuit of subrogation claims unless Travelers's policy precludes application of the common-fund doctrine.

The operative language of Travelers's policy is as follows:

The Travelers shall be entitled to priority of recovery against any such third party (including interest) to the extent payment has been made to the Insured, plus attorney's fees, expenses or costs incurred by The Travelers.

Based on this policy language, Travelers argues that a contractual right of priority over National Union extends not only to the $10 million Travelers paid to KCPL, but also excuses Travelers from having to pay any fees associated with the common fund. According to Travelers, this subrogation provision entitles Travelers to recover its own fees for the present contract dispute and defeats application of the common-fund doctrine. National Union argues the language is not sufficient to preclude application of the equitable common-fund doctrine.

Travelers I held this language was unambiguous as to the two insurers' relative priority in the underlying recoveries. Travelers I did not address the insurers' relative rights as to fees and expenses nor did it resolve any outstanding questions regarding the common-fund doctrine. We now hold that the language of this subrogation provision reasonably can be interpreted as leaving the common-fund doctrine intact, and as such, the common-fund doctrine applies.

-10-

In general, subrogation provisions: (1) may be entirely silent as to fees and expenses; (2) may declare relative priority as to fees and expenses but not specifically reference the common-fund theory; or (3) may declare relative priority as to fees and expenses and also specifically address priority in the context of the common fund or related theories. Regarding the first possibility, a subrogation provision's silence as to fees and expenses generally does not provide grounds for rejecting the common-fund doctrine where it would otherwise apply. The common-fund doctrine is well-established in Missouri, and it serves as the default rule in the absence of evidence that parties have sought to preclude its application. See, e.g., Jourdan v. Gilmore, 638 S.W.2d 763, 769 (Mo. Ct. App. 1982) ("The rule . . . is in harmony with the general rule that courts of equity have power to charge funds realized from, or preserved by, litigation with costs and expenses of litigation.") (citations and internal quotation marks omitted). Regarding the final possibility, courts have recognized that parties may, by specific reference, contract around application of the common-fund doctrine. See, e.g., Longaberger Co. v. Kolt, 586 F.3d 459, 472 (6th Cir. 2009) (rejecting an argument that an ERISA plan must share in the expenses of creating a subrogation fund where the plan language stated, "The Plan's rights shall not be subject to reduction *under any common fund or similar claims or theories*.") (emphasis added).

Regarding the second possibility, any number of additional details may be present in the language of a policy to expand or limit the scope of priority in fees in a way that may impact the common-fund analysis. Such is the case with the policy language at issue in the present case. The language of the present subrogation provision is not an unadorned reference to fees and expenses. Moreover, we are not called upon to determine whether a bare reference to fees and expenses might in some contexts be sufficient to defeat application of Missouri's common-fund doctrine. Here, the language is inherently limited in scope, and as such, we find it appropriate to interpret that language as being non-expansive and insufficient to defeat application of the default equitable rule.

The language of the quoted provision applies to "fees . . . *incurred by The Travelers*." (Emphasis added). It is reasonable to interpret this language as limiting priority over fees and expenses to only those fees and expenses actually incurred through Travelers's own acceptance of risk and participation in subrogation litigation. Use of the phrase "incurred by The Travelers" suggests an outlay of funds and expenditure of effort. While this contractual provision reasonably might be interpreted as extending to common-fund fees, such an interpretation is not sufficiently clear to defeat the equitable obligation imposed by the common-fund doctrine.

In Leggett v. Missouri State Life Insurance Company, the Missouri Supreme Court described and applied the common-fund doctrine, stating, "[W]here one goes into a court of equity *and takes the risk of litigation on himself*" to create a common fund, "others will not be allowed to lie back and share the results of the successful labors without contributing their proportionate part of counsel fees." 342 S.W.2d 833, 936 (Mo. 1961) (en banc) (emphasis added). The purpose of the doctrine, then, is to defeat the inequitable result of putting expense and risk on the party who incurs fees but to allow another party to share in recovery without sharing such risk. The fees, expense and risk associated in the subrogation litigation in this matter were born entirely by KCPL and National Union. No such expense or risk was "incurred" by Travelers. This interpretation, therefore, is fully consistent with the purposes behind the common-fund doctrine.

Further, to the extent the language at issue is ambiguous, we follow Missouri law in this instance and construe the language against the drafter. See Mendenhall v. Prop. and Cas. Ins. Co. of Hartford, 375 S.W.3d 90, 92 (Mo. 2012) (en banc). Here, the doctrine is sufficiently well-established that a party seeking to contract around its application reasonably may be expected to specifically address the doctrine. Cf. Longaberger, 586 F.3d at 472. The failure to do so resulted in an ambiguity, and we will not construe it in the drafter's favor to defeat application of the common-fund

doctrine.[4]   The common-fund doctrine applies, and Travelers must share in the expense of the common fund.

## 2.     Calculation of Fee

The "amount of any [attorney fee] award 'rests within the sound discretion of the [district] court and we will not disturb [the district court's decision] absent a clear abuse of that discretion.'" Wescott Agri–Prods., Inc. v. Sterling State Bank, Inc., 682 F.3d 1091, 1094 (8th Cir. 2012) (second and third alterations in original) (quoting Litton Microwave Cooking Prods. v. Leviton Mfg. Co., 15 F.3d 790, 796 (8th Cir. 1994)).  In the context of common-fund cases, we have recognized an even greater degree of discretion and have stated that district courts may elect between a lodestar-type analysis or a percent-of-recovery analysis.  See Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir. 1999) ("It is well established in this circuit that a district court may use the percentage of the fund methodology to evaluate attorney fees in a common-fund settlement[.]") (citation omitted); Johnston v. Comerica Mortg. Corp., 83 F.3d 241, 246 (8th Cir. 1996) (applying the common-fund doctrine and stating, "It is within the discretion of the district court to choose which method to apply.").

Travelers's arguments against the district court's award range from challenges based upon National Union's and KCPL's relative recoveries and relative expenditures, on the one hand, to simple evidentiary challenges, on the other. Importantly, the present case involves additional factors not likely to be present in

---

[4]Travelers also argues that, even if it otherwise might be responsible for fee expense, the moment it is forced to bear a share of the common-fund fee expense, it will have "incurred," at that point in time, a fee expense and will be entitled to reimbursement.  We reject this argument as a mere continuation of Travelers' underlying argument concerning the clarity of the contract language and its sufficiency to defeat application of the common-fund doctrine.

mine-run common-fund situations: Travelers specifically waived the right to control and participate in the underlying litigation, and National Union and KCPL both are entitled to the benefit of the bargain they struck with one another through the Allocation Agreement. Through that agreement, National Union and KCPL settled upon a manner to divide expenses and recoveries and agreed to characterize portions of the recoveries as insured or uninsured losses. Both parties then arranged their own fee structures with counsel. KCPL arranged for a contingency fee structure, and National Union did not. Further, the underlying litigation was technical in nature, and it is doubtful any particular efforts could be accurately and precisely segregated among different stages of the subrogation litigation. The district court was well aware of this complicated background when determining the method for calculating a common-fund offset.

Given this background, we are in general agreement with the district court's fee decisions with one important exception: we believe it is necessary to view the "common fund" in this case as National Union's 55% share of the Rockwell judgment rather than the entire $97 million Rockwell judgment. Travelers I expressly limited Travelers's ability to recover subrogation proceeds to Travelers's claim against National Union. This claim was for subrogation proceeds that the Allocation Agreement characterized as insured losses. KCPL is not liable to Travelers for a reimbursement of subrogation proceeds because KCPL's subrogation proceeds represent only uninsured losses. Further, KCPL is not a party to the present appeal, and there is no argument presently before our court suggesting that National Union is seeking to collect fees for reimbursement to KCPL. We therefore find no basis for reducing National Union's liability to Travelers based upon KCPL's litigation expenses. The credit pursuant to the equitable common-fund doctrine in this case should reimburse the liable party, National Union, for a portion of its own expenses; it should not be a windfall indexed to KCPL's expenses and unrelated to fees and expenses National Union actually incurred. See supra note 3.

-14-

Defining the common fund as $53.35 million (National Union's 55% share of the $97 million Rockwell judgment), and refusing to grant National Union credit for fees that KCPL expended to secure the portion of the Rockwell judgment representing uninsured losses, we otherwise adopt the district court's methodology and adjust the fee calculations as follows. National Union asserted, and the district court found, that National Union's fees and expenses attributable to securing its 55% share of the Rockwell judgment were $2,641,987. Travelers's $10 million award is 18.74% of this $53.35 million common fund. National Union, therefore, is entitled to a credit of $495,108—18.74% of its fees and expenses—against its liability to Travelers.

Regarding evidentiary challenges, the sums at issue are supported by affidavits from counsel sufficient to provide a factual foundation for a common-fund recovery. Here, because of the district court's substantial and uniquely broad authority, we find no abuse of discretion. The fee award is appropriate given the general equitable underpinnings of the common-fund doctrine, and it reasonably imposes upon Travelers's the same proportionate attorney fee expense as incurred by National Union. We are not called upon to review whether the present award or the process in determining that award would be sufficient for determination of fees in a normal fee-shifting or contingent-fee case. Such cases do not involve the same degree of discretion afforded in the specific context of the equitable common-fund doctrine.

B.      Prejudgment Interest

Like the district court, National Union asserts that the phrase from footnote 8 in Travelers I, "[s]ubject to any adjustments for interest, fees, expenses, etc., as to be determined," was inherently limiting in nature. According to National Union, these categories of adjustments could only be used to decrease the $10 million award through a grant of fees, expenses, or interest to National Union, thus precluding any award of fees or interest to Travelers.

We reject this argument. Footnote 8 of <u>Travelers I</u> employed the term "adjustments" not the terms "reductions" or "deductions." Further, to the extent the phrase "subject to" taken in the abstract reasonably could be interpreted as being exclusively limiting, we reject such an interpretation in this instance. As quoted above, <u>Travelers I</u> expressly disavowed resolving the fee issue. This context, if not the express language of footnote 8, demonstrates that <u>Travelers I</u> did not use the phrase "subject to any adjustments" to mean that fees could only be entertained as reductions from the $10 million award.

Regarding interest, there is nothing in <u>Travelers I</u> or specifically in footnote 8 to suggest a different, limiting interpretation could be applied to the question of interest. Further, it is not possible to review the underlying $10 million award and conclude that an additional award of interest to National Union (an interest-based reduction in, or credit against, the amount owed to Travelers) might ever be appropriate. National Union obtained and retained the funds that <u>Travelers I</u> ordered disgorged to Travelers. Travelers at no time held or possessed sums upon which interest might be assessed, and National Union had made no such claim. There were, therefore, only two possible outcomes regarding interest on remand: an award of interest to Travelers or no award of interest to Travelers "as to be determined." Because we did not decide the issue, and because the case simply did not permit an interest-based reduction in the award to Travelers, it was error to interpret our prior opinion as precluding an award of interest to Travelers.

Turning to the question of prejudgment interest, state law governs this issue in diversity actions. See <u>Reliance Ins. Co. in Liquidation v. Chitwood</u>, 433 F.3d 660, 665–66 (8th Cir. 2006) (interpreting and applying Missouri law regarding prejudgment interest in a federal diversity action); <u>St. Joseph Light & Power Co. v. Zurich Ins. Co.</u>, 698 F.2d 1351, 1355–58 (8th Cir. 1983) (same). Pursuant to Missouri law, prejudgment interest "at the rate of nine percent per annum" is allowed:

[W]hen no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.

Mo. Rev. Stat. § 408.020.

"Interest has traditionally been used to compensate for the use of or loss of use of money to which a person is entitled." Catron v. Columbia Mut. Ins. Co., 723 S.W.2d 5, 7 (Mo. 1987) (en banc). Consistent with this description, the Missouri Supreme Court has long interpreted the phrase "moneys . . . on accounts," § 408.020,[5] to broadly encompass "debt and credit, or demands in the nature of debt and credit, between parties." Coleman v. Kansas City, 173 S.W.2d 572, 576 (Mo. 1943). Our court has repeatedly recognized this Missouri interpretation of "accounts" as establishing "that prejudgment interest [under section 408.020] may be awarded whenever the amount due is liquidated, or, although not strictly liquidated, is readily ascertainable by reference to recognized standards." St. Joseph, 698 F.2d at 1355; Reliance, 433 F.3d at 665. And in St. Joseph, our court stated that where section 408.020 applies, an award of prejudgment interest "is not a matter of court discretion; it is compelled." 698 F.2d at 1355 (quoting Slay Warehousing Co. v. Reliance Ins. Co., 489 F.2d 214, 215 (8th Cir. 1974)); see also Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 624–25 (8th Cir. 2003) (describing prejudgment interest pursuant to section 408.020 as non-discretionary and refusing to amend an award based upon a party's argument that Missouri's 9% statutory rate was excessive).

---

[5]The present, applicable version of section 408.020 was amended in 1979. The amendment related only to the interest rate, which was raised at that time from 6% to 9% per annum.

-17-

Against this backdrop, National Union argues that uncertainty about fees and expenses in the present case makes Travelers's demand for $10 million too uncertain such that Travelers's claim must be deemed unliquidated. National Union also argues generally that the issues involved in Travelers I surrounding National Union's liability were too novel and complex for a court to treat Travelers's $10 million demand as a liquidated claim.

Regarding uncertainty about fees and expenses, "the fact that a defendant interposes counterclaims, setoffs, recoupment, or defenses does not alter the fact that the amount claimed by the plaintiff is 'ascertainable,' even though the amount of the defendant's counterclaim, setoff, or recoupment may not itself be reasonably ascertainable." St. Joseph, 698 F.2d at 1356. The ongoing skirmishes in this case regarding attorneys fees, litigation expenses, and interest are exactly the types of setoffs and counterclaims encompassed by St. Joseph. These ancillary issues do not change the fact that Travelers made a firm demand for disgorgement of a fixed sum that National Union had obtained through subrogation litigation. The fact that the fee and interest demands were not fixed does not change the fixed or "ascertainable" nature of Travelers's underlying demand. See id. at 1357 ("[T]he right of one party to recover interest on a liquidated sum is not necessarily dependent upon the fact that all of the other parties' claims may be liquidated [because] . . . where a plaintiff's demand is liquidated, interposition of an affirmative plea of recoupment does not convert a liquidated demand into an unliquidated one or preclude a plaintiff's recovery of prejudgment interest, even though the plea of recoupment puts the amount payable in doubt.") (internal citation and quotation marks omitted).

We also reject National Union's more general argument that the number and complexity of issues in the first appeal to our court (and the proceedings prior to that appeal) served to make Travelers's claim too uncertain to be deemed "readily ascertainable by reference to recognized standards." Id. at 1355. We previously have recognized that "§ 408.020 . . . allow[s] prejudgment interest on a claim for indemnity

by an excess insurer," Reliance, 433 F.3d at 665, and that "an excess insurer [may] recover prejudgment interest on expenses advanced on behalf of the primary insurer," id. We have also held that prejudgment interest is appropriate where two insurers dispute their respective liabilities towards an insured, but where the total amount collectively owed to the insured is known. St. Joseph, 698 F.2d at 1356. There, we concluded, "The insurers are doing nothing more than disputing liability, and this has never been a basis under Missouri law to deny prejudgment interest." Id. at 1357.

In support of its argument that liability and the amount at issue were too uncertain to allow prejudgment interest, National Union cites Hampton Foods, Inc. v. Aetna Cas. & Sur. Co., 787 F.2d 349 (8th Cir. 1986) and Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1 (Mo. 1975) (en banc). National Union asserts that, in both Hampton Foods and Fohn, courts applying Missouri law denied prejudgment interest due to uncertainty surrounding a defendant's liability or the amount of that liability. See, e.g., Fohn, 529 S.W.2d at 5 ("[W]here the person liable does not know the amount he owes he should not be considered in default because of failure to pay."). Fohn and Hampton Foods, however, are distinguishable based on the nature of the uncertainty involved.

In Fohn, the court was required to address a question of first impression regarding the proper legal framework for measuring damages in a title insurance case. Id. at 4 (referring to the issue as "one of first impression" and concluding that the trial court "properly followed the theory advanced by plaintiffs" in adopting a method for assessing damages). And in Hampton Foods, there was great uncertainty as to both the insurer's liability towards the insured and as to damages. There, an insured "was forced to vacate its building due to danger of the building's collapse." Hampton Foods, 787 F.2d at 351. Importantly, the uncertainty in Hampton Foods did not exist merely because the parties disputed the amount at issue. Rather, the uncertainty existed because no prior law established a standard by which to measure the type of

-19-

damages at issue. Our court affirmed a denial of prejudgment interest, expressly distinguishing the St. Joseph line of cases and stating:

> Here, the problem is not simply that Aetna denied liability or that Hampton's damages could not be ascertained with precision. Instead, Hampton's claim presented a novel situation where there was justifiable lack of certainty as to whether liability existed and as to the measure of damages. Under such circumstances, we agree that the damages were not sufficiently ascertainable to justify an award of prejudgment interest.

Hampton Foods, 787 F.2d at 353 (internal citations omitted).

The present case is much more akin to St. Joseph than Hampton Foods or Fohn. In the present case, other than ancillary issues such as interest, fees, and expenses there was no uncertainty surrounding the amount of Travelers's claim: $10 million. No uncertain measurements of damage existed and no framework for assessing liability or calculating damages was missing. Rather, this case involved a run-of-the-mill liability dispute. The mere fact that a claim is disputed, however, does not make a claim "unliquidated" for the purpose of section 408.020.

Further, as explained in detail in Travelers I, the determination that National Union was liable for this amount was fully consistent with general insurance practices and the well-understood relationship in the insurance industry between primary insurers and true excess insurers. It was also consistent with the plain language of the excess policy—which we found to be unambiguous in this regard—and it was a fixed sum subject only to disputes concerning litigation fees and interest. Finally, it was fully consistent with the limited express waiver in which Travelers clearly preserved the right to assert subrogation priority specifically over the Rockwell judgment proceeds.

Based on the foregoing, we conclude that Travelers's claim was not too uncertain, novel, or speculative under the theory of Hampton Foods. Travelers,

therefore, is entitled to prejudgment interest at the statutory rate of 9% per annum on the $10 million judgment.

Although Travelers presents various arguments concerning the date on which prejudgment interest should begin to run, we hold that such interest began to run on July 21, 2006.[6]  Travelers concedes that the parties agreed to suspend prejudgment interest for a 42-day period in 2011, and National Union does not suggest that any other agreement or suspension was in place.  We entered judgment directing National Union to pay Travelers $10 million on September 2, 2010, subject to adjustment for fees, expenses, and interest.  We hold today that the common-fund offset is $495,108, resulting in an adjusted award of $9,504,892 to Travelers.  We therefore hold that simple (non-compounded) prejudgment interest accrued on this adjusted amount from July 21, 2006 through September 2, 2010, for 4 years and 43 days (1504 days) less the 42-day suspension period for a total of 1462 days at a rate of 9% per annum.  This results in prejudgment interest of $3,424,105.

C.    Postjudgment Interest

Federal law governs our analysis of postjudgment interest.  Capella Univ., Inc. v. Exec. Risk Specialty Ins. Co., 617 F.3d 1040, 1051–52 (8th Cir. 2010).  Federal

---

[6] Travelers filed its initial complaint on November 18, 2005, and that complaint contained a clear demand for $10 million.  In its responsive brief in this appeal, Travelers asserts November 18, 2005, as the date from which prejudgment interest should be determined.  Travelers, however, does not indicate when it served this initial complaint upon National Union.  Further, Travelers argued in its opening brief to our court (and in briefing to the district court) that it made its firm demand for $10 million "no later than" the filing of its *first amended complaint*, July 21, 2006. Accordingly, we accept Travelers's argument as presented to the district court that it made a firm demand "no later than" July 21, 2006.  See Reliance, 433 F.3d at 665 ("Absent an earlier demand, Missouri law considers the date that the lawsuit was filed as the date of demand.").  We reject other arguments attempting to establish an earlier date for calculation of a prejudgment interest award.

Rule of Appellate Procedure 37(a) states that, "Unless the law provides otherwise, if a money judgment in a civil case is affirmed, whatever interest is allowed by law is payable from the date when the district court's judgment was entered." At the same time, the United States Code provides that, "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The combination of Rule 37 and § 1961 has led this court to hold that, "Postjudgment interest is mandatory under 28 U.S.C. § 1961 . . . and should therefore be awarded." Hillside Enters. v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995); see also id. (providing for postjudgment interest although it was not requested in the district court); Dunn v. HOVIC, 13 F.3d 58, 62 (3d Cir.), cert. denied, 510 U.S. 1031 (1993) (holding that "post-judgment interest is awarded by statute as a matter of law so it is automatically added, whether or not the district court orders it"). This authority permits the court of appeals to direct an entry of judgment that includes postjudgment interest. In re Pester Refining Co., 964 F.2d 842, 850 (8th Cir. 1992) (modifying a judgment of a district court "to provide for post-judgment interest in accordance with 28 U.S.C. § 1961").

National Union correctly argues that Travelers raised the specific issue of entitlement to postjudgment interest only as a matter of state law and only with reference to the state prejudgment interest rate of 9% per annum. Travelers argues that its request below and in the notice of appeal was, nevertheless, sufficient to encompass any type of postjudgment interest. National Union argues the failure to cite federal law serves as a waiver of postjudgment interest. We disagree with National Union and do not believe that Travelers's conspicuous request for postjudgment interest is fatally flawed in this case merely by the failure to cite to federal law.

We reach this conclusion for several reasons. First, as just discussed, a failure to request postjudgment interest is not fatal to a prevailing party's entitlement to such interest. Hillside Enters., 69 F.3d at 1416. Given this fact, we find no need to

champion form over substance and penalize a party for referencing state law when a wholesale failure to address the issue would not have precluded an award of postjudgment interest. Second, aside from the interest rate to be applied, National Union has identified no material distinction between the availability of postjudgment interest in this instance under federal law and Missouri law. As such, it is not the case that Travelers's failure to cite to federal law on postjudgment interest deprived a party or a court of an opportunity to address the issue. Further, because the district court on remand summarily denied all of Travelers claims for interest, fees, and expenses based on the belief that the first panel opinion required such an outcome, there has been no expenditure of judicial resources and there is no practical, efficiency-related reason to treat the issue as waived.

It remains necessary to determine the amount of postjudgment interest that is due. National Union paid Travelers $6,013,017.15 on December 28, 2011, in partial satisfaction of its liability towards Travelers. That amount was an outstanding unpaid postjudgment award from the entry of our prior judgment, on September 2, 2010, until the time of payment. Travelers is therefore entitled to postjudgment interest at the prevailing federal rate on this amount for the period of time this portion of the judgment remained unpaid: from September 2, 2010 through December 28, 2011.

Further, the remaining unpaid portion of our adjusted September 2, 2010 judgment ($9,504,892 less $6,013,017.15 paid) is $3,491,874.85. Postjudgment interest has accrued on this amount from September 2, 2010 through present and will continue to accrue until payment.

Finally, as addressed above, we hold today that Travelers is entitled to $3,424,105 in prejudgment interest. Postjudgment interest will accrue on this amount commencing with entry of judgment. See Arthur Young & Co. v. Reves, 937 F.2d 1310, 1338 (8th Cir. 1991) (applying postjudgment interest to an underlying judgment and to the prejudgment interest on that judgment).

III.    Conclusion

We affirm the district court's application of the common-fund doctrine but amend the amount of the common-fund offset.  In addition, we reverse the denials of prejudgment and postjudgment interest and direct the district court to enter judgment as follows:

(1)    National Union is ordered to pay to Travelers $6,915,979.85 (the original $10 million award from our September 2, 2010 judgment less $495,108 in common-fund fees and expenses less $6,013,017.15 already paid plus $3,424,105 in prejudgment interest).

(2)    National Union is ordered to pay to Travelers postjudgment interest at the applicable federal interest rate for postjudgment interest pursuant to 28 U.S.C. § 1961 on the following amounts:

(A)    the $6,013,017.15 that was outstanding between our initial judgment of September 2, 2010, and the date of partial payment, December 28, 2011;

(B)    the remaining $3,491,874.85 unpaid portion of the initial judgment that has not been satisfied through partial payment or common-fund offsets and that has been outstanding following our judgment of September 2, 2010, and that remains outstanding; and

(C)    today's new $3,424,105 award of prejudgment interest commencing with entry of judgment in this appeal and continuing through the eventual date of payment.

_____